Exhibit A

# SHERTUKDE -V- MTD - HEMCHANDRA SHERTUKDE - 7/23/03

## Page 1 to Page 152

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT   06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

### Page 25

1  type of services that are provided?
2  A.  I have no idea. I just know that – I don't get
3  involved in that.
4  Q.  You're not directly involved in the healthcare
5  service?
6  A.  No, I'm not.
7  Q.  Okay. And I take it you and your wife have
8  children?
9  A.  Yes.
10 Q.  Can you tell me their names and dates of birth or
11 their names and ages?
12 A.  First one is a doctor, Amola, A-M-O-L-A, born
13 12/31/1982.
14 Q.  Okay.
15 A.  Karan, K-A-R-A-N, is a boy.
16 Q.  Okay.
17 A.  And it is 9/24/88.
18 Q.  Okay.
19 A.  And the last one is also a boy Rohan, R-O-H-A-N,
20 9/21/89. So their ages are 20, 14, and 13.
21 Q.  Thank you.
22 A.  You're welcome.
23 Q.  Do all the children still live at home with you?
24 A.  Except the daughter who comes on vacation. She's
25 a prospective senior in William and Mary.

### Page 26

1  Q.  She's in college now?
2  A.  She's in college.
3  Q.  How long has she been in college?
4  A.  The last few years.
5  Q.  She would have been away at college when this
6  accident happened?
7  A.  Yes.
8  Q.  And I have your current residence as 11 Windham,
9  W-I-N-D-H-A-M Drive in Simsbury?
10 A.  That's correct.
11 Q.  How long have you lived there?
12 A.  Approximately September of 1994, I guess –
13 September or October. I don't know. I don't remember, but
14 since '94.
15 Q.  And I take it you reside there with your wife and
16 your children?
17 A.  Yes, since '94, yes.
18 Q.  Anyone else – extended family members, anyone
19 else live there?
20 A.  My own mother came to stay with us in, let's see,
21 February of 2000, yes.
22 Q.  Okay.
23 A.  She's no longer with us. She's deceased last
24 June in India. She went back in December of 2001 and died
25 in June of 2002.

### Page 27

1  Q.  Okay. Prior to your current address, where did
2  you live?
3  A.  246 Willowcrest Drive, Windsor, Connecticut
4  06095.
5  Q.  And how long did you reside at that address in
6  Windsor?
7  A.  I think it's March of 1989 to, you know, the
8  beginning of September of 1994.
9  Q.  How about – before the Willowcrest Drive
10 address, where did you live?
11 A.  I was at 25 Northwood Apartments in Storrs,
12 Connecticut. I don't remember the ZIP Code but – it is
13 06268. I think that's correct.
14 Q.  How long did you live at the Northwood Apartment
15 address?
16 A.  For about a year.
17 Q.  Okay. So that would take us back to about 1988?
18 A.  Yes.
19 Q.  Okay. Where did you live prior to that?
20 A.  In the same apartment complex but at 45 Northwood
21 Apartments.
22 Q.  How long there?
23 A.  Since 1984, since September of 1984, if I recall.
24 Q.  Okay. Sir, can you describe your educational
25 background starting with high school?

### Page 28

1  A.  Starting from high school – I did my high school
2  in India, in Bombay. I graduated from high school in 1969.
3  I did one more year of college. It is College of the First
4  Year of Science, also in Bombay. In 1970, I got admission
5  into the Indian Institute of Technology in 1970 for the
6  Bachelor of Technology program in electrical engineering. I
7  graduated from IIT in, somewhere around April of 1975.
8  Q.  So you went there from approximately 1970 to
9  1975?
10 A.  Five years. The program then was 5 years, and
11 now it is 4.
12 Q.  Again, what degree did you acquire?
13 A.  Bachelor of Technology, Honors in electrical
14 engineering.
15 Q.  Have you had any additional training?
16 A.  Yes. I joined the University of Connecticut in
17 August – I think it's August or September – September of
18 1983 in the Master's of Science program with concentration
19 in controls and communications. But in the electrical
20 engineering department it was called electrical and systems
21 engineering department.
22 Q.  And how long did you study there?
23 A.  I graduated with my master's in December of 1985.
24 Q.  And your master's degree is, again, what?
25 A.  Master's of Science in electrical engineering. I

Page 29

1  don't know the exact wording, but it should be on my
2  certificate. But it is MS and double E.
3  Q. Okay.
4  A. And then I proceeded further to get my Ph.D. in
5  controls and communications in the same department.
6  Q. And when did you receive that?
7  A. I graduated -- I defended my thesis in April of
8  1989.
9  Q. Okay. Now, when you graduated from the Indian
10 Institute of Technology in 1975, you were still a full-time
11 resident of India at that time?
12 A. That's correct.
13 Q. When did you come to the U.S.?
14 A. September of 1983 when I came to UConn, but I
15 also came to USA prior, in 1981.
16 Q. Okay. Could you tell me about what you did
17 between 1975 and coming to the U.S. in 1983?
18 A. I worked for two companies -- one is called
19 Telco -- from 1975 --
20 Q. Can you spell that one for me?
21 A. T-E-L-C-O.
22 Q. Okay. When did you work for them?
23 A. 1975 to 1977. I don't know the exact dates, but
24 that's the year.
25 Q. And that's fine. What is Telco? What kind of

Page 30

1  company is it?
2  A. I was a graduate trainee to start with for the
3  first 2 years, and then I was absorbed as an assistant
4  engineer, maintenance, in the electrical engineer
5  department.
6  Q. What does Telco do?
7  A. Telco manufactures trucks.
8  Q. What kind of trucks?
9  A. Full size truck service, the ones that you see on
10 the road.
11 Q. Over-the-road trucks?
12 A. Yes.
13 Q. As an assistant engineer, did you stay in the
14 maintenance department?
15 A. For the electrical engineer, yes.
16 Q. What were your duties?
17 A. To maintain the electrical systems, check the
18 fuses, check the transfer lines, checking the power systems,
19 etc.
20 Q. Is that essentially what you did for your two
21 years there?
22 A. Yes.
23 Q. Where did you go after Telco?
24 A. Compton Graves Limited in Bombay, from 1977 to,
25 probably before coming here in 1983, which was August.

Page 31

1  Q. What sort of company or operation is Compton
2  Graves?
3  A. They manufacture and sell electrical power
4  transformers, and I was in the transformer division.
5  Q. What was your job title?
6  A. I joined the company in 1977 as a management
7  trainee. And after a year, I was absorbed in the
8  transformer division. And my first title, if I recall, was
9  assistant engineer, design.
10 Q. What were your duties as an assistant engineer,
11 design?
12 A. To design the electrical aspects of the
13 transformers, electrical power transformers.
14 Q. And did your position at Compton Graves change?
15 A. Yes. The next year I was promoted to design
16 engineer.
17 Q. What were your duties as a design engineer?
18 A. Same thing, but with some people working now
19 under me.
20 Q. Did your position change after?
21 A. You're right.
22 Q. What was that?
23 A. It changed to production, core and coil division.
24 Q. Core and coil division. Okay.
25 A. That was probably in 1981.

Page 32

1  Q. And as a production superintendent, what was your
2  job.
3  A. To oversee the manufacture of electrical power
4  transformers, and the core and coil section of it.
5  Q. I take it you were there until you left in 1983
6  to come to the US?
7  A. That's correct.
8  Q. Now, while you were studying in the U.S., were
9  you also working?
10 A. As a graduate student, you can only work 20 hours
11 as a research assistant to my advisor, and a teaching
12 assistant, yes.
13 Q. You were a teaching assistant at UConn?
14 A. Yes.
15 Q. What were your teaching assistant assignments
16 while you were studying at UConn?
17 A. As the laboratory aide and helper in the
18 electrical laboratories, like a teaching assistant for the
19 electrical labs, which, I don't recall right where the
20 electronics laboratories --
21 Q. What sort of things did you do as the teaching
22 assistant in the electrical laboratories?
23 A. Help the professor, to conduct the laboratories,
24 which involves some electrical experiments, setting up some
25 circuits and evaluating their performance, electrical and

### Page 33

1  electronic circuits. I soon became a research assistant, so
2  those things changed.
3      Q.    As a research assistant, did you work for any one
4  particular professor?
5      A.    Professor Yakov Bar-Shalom.
6      Q.    You're going to have to spell that for me, I'm
7  sorry?
8      A.    Y-A-K-O-V -- if I make a mistake, don't tell him.
9      Q.    I won't.
10     A.    Last name is Bar, like B-A-R-Shalom, S-H-A-L-O-M.
11     Q.    As a research assistant for Professor Bar-Shalom,
12 what did you do?
13     A.    We designed signal processing systems for the
14 customers that Professor Bar-Shalom received grants from.
15     Q.    Okay. Can you give me an example of the type of
16 signal processing system that you worked on?
17     A.    This is a military secret, so don't tell anybody.
18     Q.    You can describe very generally.
19     A.    I have a partial military clearance also. We
20 worked for the Office of Naval Research, U.S. Air Force, and
21 Space and War and designed multitarget, multisensor tracking
22 systems using passive sensors.
23     Q.    Did you have any other assignments either as a
24 research assistant or as a teaching assistant at UConn?
25     A.    Nope.

### Page 34

1      Q.    Okay. And does that take us right up to 1989
2  when you got your Ph.D.?
3      A.    No, it takes us up to August of 1988 --
4      Q.    Okay.
5      A.    -- when I was employed by the University of
6  Hartford as an assistant professor in the electrical and
7  computer engineering department.
8      Q.    And have you continued your employment at the
9  University of Hartford to the current day?
10     A.    Yes.
11     Q.    And has your title changed?
12     A.    Yes.
13     Q.    Why don't you give me the evolution of your title
14 at the University of Hartford?
15     A.    Received my tenure and promotion in 1992, March
16 of 1992. And the change of title was associate professor of
17 electrical and computer engineering. I then was promoted to
18 full professor of electrical and computer engineering
19 department on or around March of 1995. Those are my
20 academic titles.
21     Q.    And that's the position you hold currently?
22     A.    Yes. I am a full professor of electrical and
23 computer engineering.
24     Q.    Can you describe for me what your job
25 responsibilities have been at the University of Hartford?

### Page 35

1      A.    To teach three courses per semester or 12
2  credits, whichever is appropriate.
3      Q.    What subjects have you taught there?
4      A.    All the subjects in electrical and computer
5  engineering department related to signals, systems,
6  controls, and digital, and electrical and power machinery.
7      Q.    You said all the subjects in the electrical
8  engineering department related to signals?
9      A.    Signals.
10     Q.    What else?
11     A.    Systems, controls, digital, and electrical and
12 power machinery.
13     Q.    Does the University of Hartford have some sort of
14 curriculum statement that would describe the courses that
15 you teach?
16     A.    Yes.
17     Q.    How would that be called or --
18     A.    The bulletin -- the undergraduate bulletin or the
19 undergraduate bulletin board.
20     Q.    I take it you teach both undergrads and
21 graduates?
22     A.    Yes, I do.
23     Q.    And if I wanted to get a copy, how would I get
24 that?
25     A.    You can go on the website.

### Page 36

1      Q.    Okay.
2      A.    WWW.Hartford.EDU.
3      Q.    Do any of the courses which you taught at the
4  University of Hartford involve product design?
5      A.    Nope, except the electrical part --
6      Q.    Okay.
7      A.    -- for the power machinery.
8      Q.    Do any of the courses that you taught at the
9  University of Hartford involve product safety?
10     A.    Yes.
11     Q.    Which ones?
12     A.    The electrical power machinery.
13     Q.    Okay. What subjects of product safety do you
14 teach?
15     A.    Only related to the topic, aspects of the --
16 safety aspects.
17     Q.    What sort of safety aspects would be related to
18 those topics?
19     A.    The electrical safety aspects.
20     Q.    Would that be relative to electrocution?
21     A.    That's correct, not to touch live parts, etc.
22     Q.    Okay. What's your current salary at the
23 University of Hartford?
24     A.    Oh, boy, 70,000 for a 9-month teaching assignment
25 which goes over a 10-month period.

### Page 37

1  Q. Seventeen or seventy?
2  A. $70,000. I hope it's not 17,000.
3  Q. That sounded a little low to me for 9 months.
4  How does that compare with your salary in 2001 at the time
5  of this accident?
6  A. 2001, I don't recall, but somewhere around -- we
7  have had an annual increase, average 2.3 percent.
8  Q. So whatever it is, you have gotten the annual
9  increases?
10 A. Yes.
11 Q. Other than your salary from the University of
12 Hartford and any income generated by Diagnostic Devices, do
13 you do anything else that generates income?
14 A. No.
15 Q. Have you written or published?
16 A. Extensively.
17 Q. In what fields?
18 A. In the electrical controls and signals processing
19 areas.
20 Q. Would a copy -- withdrawn. Would a list of your
21 publications be found on the University of Hartford website?
22 A. Probably.
23 Q. Approximately how many articles have you
24 published, if you can tell me?
25 A. Approximately about 40 to 45.

### Page 38

1  Q. And, typically, where would those articles be
2  published?
3  A. In the IEEE transactions, which were the
4  journals, and all the proceedings of the IEEE conferences.
5  Q. IEEE is what?
6  A. Good question, International Electrical and
7  Electronic Engineers.
8  Q. I take it you're a member of IEEE.
9  A. Yes, I am. I'm a senior member.
10 Q. And did you have to take any tests, or did you
11 have to do anything to qualify to become a member?
12 A. You have to be a student member, which I was when
13 I was at UConn. And then you progress, and then you get
14 elected to the senior membership through a process, which I
15 was done in 1992.
16 Q. Are you a member of any other professional
17 organizations?
18 A. SPIE. If I recall the whole form, it's -- I
19 don't recall the full form of the acronym, but it's SPIE.
20 It's a signal processing, but you can go on the website. If
21 you go to WWW.spie.org or whatever, you should get it.
22 Q. Would there be a similar website for IEEE?
23 A. Yes, IEEE.org.
24 Q. Are you a member of any other professional
25 organizations?

### Page 39

1  A. I was AIAA, American Institute of Aeronautics and
2  Astronautics.
3  Q. Aeronautics and what?
4  A. Astronautics.
5  Q. Astronautics, okay. And what was your
6  involvement with that group?
7  A. I was also a senior member of that group. All
8  that came through because of the research done in the air
9  force.
10 Q. I take it you no longer maintain that
11 affiliation?
12 A. With AIAA?
13 Q. Correct.
14 A. I have been listed, but I'm not a paying member
15 as they say. I'm a paying member of IEEE.
16 Q. Any other professional organizations?
17 A. Eta Kappa Nu, Tau Beta Pi. Those are the honor
18 societies.
19 Q. Okay. Now, we discussed briefly your prior
20 lawsuit against Isabell Caldwell?
21 A. Uh-huh.
22 Q. Other than that, have you been involved in any
23 other lawsuits?
24 A. Nope.
25 Q. When did you first acquire the Yardman snow

### Page 40

1  thrower involved in this accident?
2  A. Somewhere around March of 1989.
3  Q. And where did you purchase it?
4  A. I think it's the -- if I recall, it's the SNS
5  Equipment Shop on Locust Street or Drive in Hartford. I
6  think the label should be there on the -- I don't know the
7  exact location, the number on the street, but it's Locust
8  Street, I guess.
9  Q. Was the machine new when you purchased it?
10 A. Yes.
11 Q. And why did you have to purchase that?
12 A. Because we had just moved into Windsor,
13 Connecticut, in March of 1989, and there was a lot of snow.
14 I wanted to use the snow thrower.
15 Q. So you purchased it for use at your personal
16 residence?
17 A. That's correct.
18 Q. Do you recall the purchase price?
19 A. Approximately $600 to $650.
20 Q. And did the product come with any documents or
21 materials?
22 A. The receipt and that user's manual.
23 Q. The manual we've marked here as Exhibit 2?
24 A. Yes.
25 Q. Anything else?

### Page 49

1  A.  He also worked on our rider mower. He also
2  probably worked on the walk-behind, self-propelled. I might
3  be wrong. I do not know, but the rider mower, yes. He has
4  changed the battery on that – and Bloomfield Hardware when
5  we were in Windsor.
6  Q.  So you purchased this Yardman snow thrower in
7  1989. It would be about 12 years before the date of this
8  accident?
9  A.  Approximately, yes.
10  Q.  Can you describe for me how you used that snow
11  thrower in the years leading up to the time of the accident?
12  A.  Regularly, as you would use a snow thrower when
13  the snow falls and you want to clear your driveway.
14  Q.  You used it to clear your driveway of your home
15  in Windsor?
16  A.  Yes.
17  Q.  You used it to clear your driveway in your home
18  in Simsbury?
19  A.  That's correct.
20  Q.  Did you use it at any other locations?
21  A.  No.
22  Q.  How big is your driveway in Windsor?
23  A.  Approximately the same size as in Simsbury.
24  Q.  Okay. How big is your driveway in Simsbury?
25  A.  Approximately, it is an L-shaped driveway – it

### Page 50

1  is about 40 to 50 feet on the small side of the L and about
2  80 to 90 feet on the long side of the L, give or take, plus
3  or minus 5 feet.
4  Q.  I realize you're estimating. If you add those
5  two dimensions together you have someplace in the area of
6  130 to 140 feet of driveway?
7  A.  Approximately. The Windsor might be a little
8  smaller, but the same dimensions and shape.
9  Q.  And in terms of the width, it's a single driveway
10  or double driveway?
11  A.  What do you mean by single driveway?
12  Q.  I mean is it – withdraw. Bad question. How
13  wide is the driveway?
14  A.  Just enough for one car to go on the longer side.
15  Q.  Okay. Twelve, fourteen feet, something like
16  that?
17  A.  Probably approximately that. That's a good
18  estimate. But on the broad side, it is broader than that.
19  Two cars can go through.
20  Q.  Again, can you give me an estimate as to the
21  approximate number of times in the year that you use that?
22  A.  All depending upon the number of snowstorms. So
23  the – it depends. I don't have a history of that, but
24  approximately three to four times or more.
25  Q.  Okay. When you used it in Windsor, again,

### Page 51

1  approximately how long would it take to clear the driveway?
2  A.  How long would it take to clear the driveway –
3  probably a half hour to 45 minutes.
4  Q.  Would the same be true of the property in
5  Simsbury?
6  A.  A little more in Simsbury because of the –
7  because of the surrounding parts around the driveway in
8  Simsbury. I have a retaining wall in Simsbury, which we
9  didn't have in Windsor.
10  Q.  How long would your estimate be?
11  A.  Approximately 45 minutes to 1 hour approximately,
12  and I'm getting old, so things change.
13  Q.  Okay. Were you the primary operator of this
14  product?
15  A.  Yes.
16  Q.  Anyone else in your family use it?
17  A.  Nope.
18  Q.  Friends, neighbors?
19  A.  Nope.
20  Q.  As far as you know, did anyone else ever use that
21  product other than you?
22  A.  Nobody ever went close to it, and I don't go
23  close to it now.
24  Q.  Okay. Now, you mentioned that you did bring the
25  owner's manual?

### Page 52

1  A.  Yes.
2  Q.  Did you read it or look at it more than once?
3  A.  Probably.
4  Q.  How often, do you know?
5  A.  Well, just in case I lost track of the use of it,
6  so – because there's a big gap between winters.
7  Q.  Okay. Are you generally familiar with the
8  operation of the product?
9  A.  General operations, yes.
10  Q.  Are you familiar with the names and the functions
11  of the controls?
12  A.  Generally, yes.
13  MR. BOGDANSKI:  I'll mark as Exhibit 7 – this is
14  a schematic showing some of the controls.
15
16  (Defendant's Exhibit No. 7, controls schematic,
17  marked for identification.)
18
19  Q.  (By Mr. Bogdanski) I ask you to take a look at it
20  for a second. Do you see the item identified as shift
21  lever?
22  A.  Yes.
23  Q.  What is your understanding of that control? How
24  does it work? What does it do?
25  A.  Well, it shifts the speed of the motion of the

### Page 57

1 A. Probably, but not in the general sense.
2 Q. What do you mean by that?
3 A. I have no idea. You have to rephrase the
4 question.
5 Q. Okay. Did you understand, again, prior to the
6 time of the accident, that if you permitted your body to
7 come into contact with these moving parts while the engine
8 was running that you could become injured?
9 A. Whenever it was indicated, yes.
10 Q. Okay. And did you know that based on your
11 training as an engineer or is it just common sense?
12 A. It's from the manual, the reading of the manual.
13 Q. You understood the risks that existed based on
14 your reading of the manual?
15 A. That's correct.
16 Q. Prior to the time of the accident, did you
17 experience any mechanical problems with the snow thrower?
18 A. Nope, only the startup problems.
19 Q. Occasionally it was difficult to start it?
20 A. That's correct.
21 Q. Other than the starting problems, did you
22 experience any other mechanical problems with the snow
23 thrower?
24 A. Nope.
25 Q. Again, this is prior to the date of the

### Page 58

1 accident --
2 A. Nope.
3 Q. -- as far as you can tell?
4 A. As far as I can tell, yes.
5 Q. As far as you can tell, once the machine got
6 started, it always ran the way it was supposed to run?
7 A. That's correct.
8 Q. As far as you could tell, once the machine was
9 started, all the controls functioned as they're supposed to
10 function?
11 A. As they indicated in the manual, yes.
12 Q. Did you ever have -- experience a situation where
13 the machine did not respond to one of the controls?
14 A. That's correct.
15 Q. Did you?
16 A. Yes.
17 Q. Was this -- I'm talking about prior to the time
18 of the accident.
19 A. That's correct.
20 Q. Okay. What did you experience?
21 A. Well, when the snow -- the size of the snow was
22 large, it could stall.
23 Q. Okay. Occasionally, you'd get snow jammed in it?
24 A. That's correct.
25 Q. Okay. Anything else?

### Page 59

1 A. That's it.
2 Q. Okay. And, again, prior to the time of the
3 accident when you experienced that, when snow would come --
4 snow would get in the machine, you say it would stall?
5 A. It would stall, meaning it would stop, stop
6 throwing the snow.
7 Q. What would you normally do when that occurred?
8 A. I would check for what is wrong with it.
9 Q. How would you correct this situation?
10 A. Well, I would stop the machine and basically look
11 for what is it that is stalling it.
12 Q. Okay. What would you find?
13 A. I don't recall, but, typically, it would be a lot
14 of snow accumulated in the auger. That's the most visible
15 part.
16 Q. The auger, again, that's what we circled in
17 Exhibit 10. You'd see snow jammed in there?
18 A. Yep.
19 Q. How would you go about fixing that condition?
20 A. I wouldn't touch it.
21 Q. Okay. What would you do?
22 A. I would let it get -- melt down.
23 Q. Just let it melt down?
24 A. Take a break or try -- wait for a long time and
25 then do it because by the time it has some time to stay at

### Page 60

1 rest, typically the snow would fall out.
2 Q. Okay. And, again, prior to the time of the
3 accident, did you ever experience snow getting jammed in the
4 discharge chute?
5 A. That's right, I would.
6 Q. And on those prior occasions, how would you deal
7 with that?
8 A. I had a stick that I would use to unclog the
9 chute.
10 Q. And would you typically do that with the engine
11 running or the engine turned off?
12 A. Turned off.
13 Q. Prior to the time of the accident, prior to
14 February of 2001, did you ever sustain any injuries while
15 using the Yardman snow thrower?
16 A. No.
17 Q. To your knowledge, again, prior to this accident
18 had anyone else ever gotten any injuries --
19 A. No.
20 Q. -- with the snow thrower?
21 A. That's right, no.
22 Q. Prior to the accident, was the snow thrower ever
23 damaged or broken in any way?
24 A. Nope.
25 Q. Prior to the accident, did you ever notice any

### Page 77

1  driveway?
2  A.  Well, it started increasing when I reached the
3  end of the driveway.
4  Q.  Okay.
5  A.  That's when the snowblower stalled.
6  Q.  And what happened when the snowblower stalled?
7  A.  It just stopped throwing the snow.
8  Q.  Okay. Engine continued to run?
9  A.  Engine continued to run.
10 Q.  Okay. What did you do at that time?
11 A.  Well, at that time, I released the two clutch
12 levers there.
13 Q.  Okay.
14 A.  Took a look at what was happening in terms of the
15 clogged chute.
16 Q.  What did you see?
17 A.  The chute was clogged.
18 Q.  And could you see?
19 A.  I also saw the auger was not moving.
20 Q.  So you were able to visualize the auger?
21 A.  Yes.
22 Q.  Was the auger portion clogged as well?
23 A.  Yes.
24 Q.  Did you make any other observations about the
25 machine at that point?

### Page 78

1  A.  Nope.
2  Q.  Okay. What did you do next?
3  A.  I started walking back to the garage to fetch my
4  stick to unclog the chute.
5  Q.  Did you turn off the engine?
6  A.  Nope.
7  Q.  Why not?
8  A.  Because I thought -- I just didn't do that that
9  day.
10 Q.  Okay. And you mentioned -- I think we talked
11 earlier, the length of your driveway, if you add the two
12 parts of the Ls, approximately 130 feet; is that right?
13 A.  Yes, approximately.
14 Q.  How long did it take you to walk back?
15 A.  At the normal speed, I cannot give you an
16 approximate time, but maybe 3 or 4 minutes or less than
17 that.
18 Q.  Okay. And, again, as I understand it, before you
19 made your decision to walk back to the garage, you first
20 took some time to look at the machine and identify the
21 problem?
22 A.  That's right.
23 Q.  You checked the chute area, and you checked the
24 auger?
25 A.  That's correct.

### Page 79

1  Q.  Approximately how long did it take you to
2  accomplish that?
3  A.  Three to four minutes.
4  Q.  Okay. What did you do when you got to the
5  garage?
6  A.  Started searching for the stick.
7  Q.  Okay. Where did you look?
8  A.  On the side near the side walls.
9  Q.  Okay. And how long did you spend looking for the
10 stick?
11 A.  Maybe 5 to 10 minutes.
12 Q.  And what happened?
13 A.  I didn't find it.
14 Q.  Okay. Did you look for something else to
15 substitute for the stick?
16 A.  No.
17 Q.  Okay. What did you do then?
18 A.  I walked back to the machine.
19 Q.  Okay. Did -- walking back the same,
20 approximately maybe 3 minutes, 4 minutes?
21 A.  Yeah.
22 Q.  When you got back to the snow thrower, was the
23 engine still running?
24 A.  Yes.
25 Q.  As far as you could see, did the auger area and

### Page 80

1  chute area still appear to be clogged with snow?
2  A.  Yes.
3  Q.  Okay. And what did you do when you got back
4  there?
5  A.  So then I decided to use my hand to unclog the
6  chute.
7  Q.  Okay. Where was the machine positioned or
8  located in your driveway at that point in time?
9  A.  Within 7 to 8 feet of the end of the driveway.
10       (A recess was taken at 12:12.)
11
12       (Defendant's Exhibit No. 10, photographs; No. 11,
13       photographs; No. 12, photographs, marked for
14       identification.)
15
16 Q.  (By Mr. Bogdanski) Sir, I'd like to show you what
17 have been marked as Exhibits 10, 11, and 12 and ask if these
18 show some photographs of your house.
19 A.  That's the driveway. That's the house on the top
20 with the driveway.
21 MR. VIDONE:   That was -- for the record, he was
22 looking at Defendant's Exhibit 10.
23 MR. BOGDANSKI:   I think they all kind of show
24 different views of the same area.
25 THE WITNESS:   Yes.

### Page 89

1 vertically up and down, it rotates on an angle.
2   Q.  It rotates on an angle, pivots on an angle?
3   A.  Pivots on an angle.
4   Q.  Okay. After you positioned your body in that
5 location with your feet and your left hand, what did you do
6 with your right hand?
7   A.  Started cleaning the clogged snow inside the
8 chute.
9   Q.  And can you describe for me how you accomplished
10 that?
11   A.  Just by putting my hand inside the chute.
12   Q.  You just made a motion here which is not going to
13 come across really good on the record, but it appeared that
14 you reached forward with your right hand and showed a
15 scooping motion with your fingers?
16   A.  That's correct.
17   Q.  And how long did you do that for?
18   A.  About a minute or two approximately.
19   Q.  Okay. Was it – did you take a small amount of
20 snow out and then take more out? How did it go?
21   A.  Whatever was there.
22   Q.  But you were scooping snow out for a minute
23 or two as best as you can recall?
24   A.  That's correct.
25   Q.  And as you were scooping snow out with your left

### Page 90

1 hand, was your hand extending further and further into the
2 mouth of the chute?
3   A.  That's right.
4   Q.  Okay. And what happened next?
5   A.  Then it got stuck inside the chute.
6   Q.  Okay. When you say "it got stuck," what do you
7 mean by that?
8   A.  It got jammed in. It got held by something else
9 inside.
10   Q.  Okay. I take it the engine was still running at
11 that point in time?
12   A.  The engine was running.
13   Q.  Okay. From your position along the side of the
14 snow thrower, could you tell whether or not the auger blades
15 were rotating or not rotating?
16   A.  I could not see that, but they were not rotating.
17   Q.  What makes you say that?
18   A.  There was no sound of rotation nor could you see
19 these pins here that are connected to the auger shafts.
20   Q.  Okay. So the auger shafts actually come through
21 the side of the housing there?
22   A.  You can see the things rotating.
23   Q.  Your recollection is that the auger blades were
24 not rotating?
25   A.  That's correct.

### Page 91

1   Q.  Okay. Did you notice any change in the sound or
2 the operation of the snow thrower before your hand got
3 stuck?
4   A.  Nope.
5   Q.  Okay. So for the minute or two that you're
6 working, scooping the snow out, up to the point where your
7 hand got stuck, there's no change that you can see in the
8 operation of the snowblower?
9   A.  That's right.
10   Q.  As far as – during that time, as far as you
11 could tell, those auger blades are not turning?
12   A.  That's correct.
13   Q.  How about the point where your hand got stuck,
14 could you tell at that point if the auger blades were
15 turning or not?
16   A.  That's right, they were not running.
17   Q.  Even when your hand got stuck, the auger blades
18 were still not turning?
19   A.  That's correct.
20   Q.  What happened next?
21   A.  Well, then I reached for the engine key to stop
22 the engine.
23   Q.  With your left hand?
24   A.  With my left hand.
25   Q.  And did the engine stop?

### Page 92

1   A.  The engine stopped.
2   Q.  And what was the condition of your right hand at
3 that point?
4   A.  It was stuck right there inside.
5   Q.  So even after the engine was stopped, your right
6 hand was still stuck?
7   A.  Yes.
8   Q.  What did you do then?
9   A.  I tried to remove my hand, and it came out. The
10 glove got stuck, and I saw the digit not there, so I grabbed
11 for the ice and put the ice on my injury.
12   Q.  So in pulling your hand out, your hand came out
13 but the glove stayed in?
14   A.  That's right.
15   Q.  And you were able to look down and see that you
16 cut off a portion of your finger?
17   A.  That's correct.
18   Q.  And you grabbed snow and ice and put it on your
19 finger?
20   A.  That's right.
21   Q.  What did you do next?
22   A.  I walked back to the basement and called out for
23 the family members and asked them to call 911.
24   Q.  And what happened after that?
25   A.  Well, after that, the ambulance came, and they

## Page 101

1  Q. Have you ever made a close inspection of this
2  snow thrower since this accident?
3  A. Nope.
4  Q. How did the rest of your driveway get cleaned off
5  that day?
6  A. I don't know. I did not even ask.
7  Q. Okay.
8  A. Because I was in the hospital for 2 days.
9  Q. Do you know if anyone used the snow thrower to
10 complete the job of the driveway?
11 A. No idea.
12 Q. Sir, what do you believe caused this accident?
13 A. I have no idea. It's probably –
14 MR. VIDONE: I'm going to object. He's not an
15 expert.
16 MR. BOGDANSKI: I'm not asking for an expert
17 opinion.
18 Q. (By Mr. Bogdanski) You were there, and you were
19 the person who operated the machine.
20 MR. VIDONE: And he responded he didn't know.
21 Q. (By Mr. Bogdanski) You don't know what caused the
22 accident?
23 A. No, I don't. I just know my hand got stuck in
24 there.
25 Q. Okay. Do you think it was a good idea for you to

## Page 102

1  stick your hand into the discharge chute with the motor
2  running?
3  MR. VIDONE: Object. You can answer.
4  THE WITNESS: I can't say that. I have no answer
5  to that.
6  Q. (By Mr. Bogdanski) Okay. What happened to the
7  snow thrower after the date of the accident?
8  A. Like I say, I have no idea. I was in the
9  hospital. It probably got brought into the garage and then
10 eventually got moved into the shed when the winter was over.
11 Q. Did your family continue to use that snow thrower
12 for the balance of that winter season?
13 A. No, all was done with the hand.
14 Q. You shovelled it by hand?
15 A. Yes.
16 Q. Did you continue to use the snow thrower for the
17 next winter season?
18 A. Never used it since the accident, scared of it.
19 Q. So you never used that snow thrower since the
20 date of the accident?
21 A. That's correct. I have not touched it, no.
22 Q. To your knowledge, has anyone else in your family
23 used that snow thrower since the date of the accident?
24 A. Nobody's used it.
25 Q. Would you be in a position to know if someone

## Page 103

1  used it?
2  A. Yes.
3  Q. It's your understanding and belief that no one's
4  used that machine since the time of the accident?
5  A. That's correct.
6  Q. Why didn't you use it?
7  A. I told you I am scared of it.
8  Q. So I take it you made a decision after the
9  accident not to use that snow thrower again?
10 A. That's correct.
11 Q. If you made the decision not to use that snow
12 thrower again, why is it that you had it serviced by Four
13 Seasons in January of 2002?
14 A. Just so that if it is needed, it could be used in
15 the worse condition, but we never used it.
16 Q. Okay. But you thought potentially you might use
17 it if it was a bad condition?
18 A. That's correct.
19 Q. But you never actually did use it?
20 A. That's correct.
21 Q. And, again, the service by Four Seasons, which is
22 shown here on Exhibit 3, that was done at your house, or did
23 he take it back to his shop?
24 A. I don't know. I don't recall where he did it –
25 no, it says pickup and deliver, so it was at his shop.

## Page 104

1  Q. Did you ever speak to Mr. Meyers about the
2  service he performed?
3  A. Nope.
4  Q. After Jim Meyers at Four Seasons returned the
5  snow thrower back to you, did you ever start it up again?
6  A. No.
7  Q. Did anyone in your family ever start it up again?
8  A. Nope.
9  Q. How did you clean your driveway over this past
10 winter?
11 A. Shovel it.
12 Q. Shovelled it by hand?
13 A. Yes, all the family members.
14 Q. You still have the snow thrower on your property?
15 A. That's right. It's in the shed though.
16 Q. But you never used it?
17 A. That's right.
18 Q. As far as you know, no one ever used it since the
19 date of the accident?
20 A. That's correct.
21 Q. After the accident, you yourself never attempted
22 to repair or fix it?
23 A. That's correct.
24 Q. After the accident, you never made any changes to
25 it?

## Page 105

1  A. That's correct.
2  Q. Other than being serviced by Four Seasons in
3 January of 2002, did anyone else perform any service or
4 maintenance on that snow thrower after the accident?
5  A. No.
6  Q. Just so I'm clear, after it was serviced by
7 Mr. Meyers at Four Seasons in January of 2002, since then
8 it's been in your garage and in your shed and not been used?
9  A. That's right.
10  Q. It's never even been started?
11  A. That's right, except the time you came and --
12 that's right.
13  Q. No one other than Four Seasons performed any work
14 on that snow thrower after that accident?
15  A. That's right.
16  Q. Now, you referred a moment ago to the time I came
17 out and took some photographs of the snow thrower after the
18 accident?
19  A. That's right.
20  Q. Other than me coming out and taking a look at it
21 that one day, has anyone else inspected or looked at the
22 snow thrower since the accident?
23  A. Mr. Marc Vidone can answer that.
24  MR. VIDONE: I can't answer.
25  Q. (By Mr. Bogdanski) There's an individual by the

## Page 106

1 name of Leslie Wilder?
2  A. Yes, that's the one.
3  Q. When was it that he came out and looked at it?
4  A. I don't recollect the time.
5  Q. I think there was a reference in a report that it
6 was sometime maybe in February of this year. Does that
7 sound correct?
8  A. That's right, yes.
9  Q. Were you present when Mr. Wilder came out on that
10 day?
11  A. Yes, I was.
12  Q. Was the snow thrower operated or started on that
13 day?
14  A. He tried to start it, but it did not start.
15  Q. Okay. Other than me coming and looking at it on
16 one occasion to take pictures --
17  A. That's right.
18  Q. -- and Mr. Wilder coming out and trying to start
19 it, to your knowledge, has anyone else come out to inspect
20 that snow thrower since the time of the accident?
21  A. Nope.
22  Q. Was there any damage to the snow thrower at the
23 time of the accident?
24  A. Not that I know of.
25

## Page 107

1  (Defendant's Exhibit No. 15, a sheet of two
2 photographs, marked for identification.)
3
4  Q. (By Mr. Bogdanski) Sir, I just marked as
5 Exhibit 15 a sheet with a couple of photographs on it. I'd
6 like to direct your attention to the upper photograph, the
7 photograph marked I-37.
8  A. Yep.
9  Q. It shows the rear of the auger housing in the
10 front of the drive wheels. Do you see that area?
11  A. Yeah, uh-huh.
12  Q. It appears that there is a pulley that is cut
13 through the rear of the housing. Do you see that?
14  A. Yes.
15  Q. Was that in that condition at the time of the
16 accident?
17  A. I have no idea.
18  Q. Is that something you ever noticed?
19  A. No, but Mr. Wilder pointed it out to me when he
20 came there. That was that first time I noticed.
21  Q. Okay. So you didn't know when that happened?
22  A. Nope.
23  Q. But as far as you know, no one operated this snow
24 thrower since the time of this accident?
25  A. That's right.

## Page 108

1  (Discussion was held off the record.)
2  (A recess was taken at 12:58.)
3  (Back on the record at 1:38.)
4  Q. (By Mr. Bogdanski) Sir, you've indicated that
5 after the date of the accident, you exchanged e-mails with
6 MTD, is that correct --
7  A. Yes.
8  Q. -- or with Yardman; is that correct?
9  A. Yeah, one of the two -- only one though. I send
10 one; they replied.
11  Q. You actually made reference to the Yardman
12 website address that you might have gotten probably?
13  A. Yes.
14  Q. Did you ever send any documents to either Yardman
15 or MTD after this accident?
16  A. Nope.
17  Q. Did you ever speak to any investigators about
18 this accident?
19  A. Nope.
20  Q. All right, sir, I would like to direct your
21 attention to the owner's manual, which we have marked here
22 as Exhibit 2. On the front page about three quarters of the
23 way down, it says, "Important: Read safety rules and
24 instructions carefully." Do you see that statement?
25  A. Yes.

## Page 113

1  A.  It doesn't show that way.
2  Q.  What do you understand it to show?
3  A.  It shows me – there is a hand with the fingers
4  touching the rotating part.
5  Q.  Okay. And to the right of that, there is a
6  triangle with an exclamation point in it?
7  A.  Yes.
8  Q.  Under where it says the large word "Danger"?
9  A.  Yes.
10 Q.  What did you understand that to mean?
11 A.  It just says there is danger there.
12 Q.  Okay. The wording of the warning which says shut
13 off engine before unclogging discharging chute, what did you
14 understand that to mean?
15 A.  Shut off engine before unclogging. That's
16 exactly what it says.
17 Q.  You understood it could be dangerous if you
18 didn't do that?
19 A.  It says danger.
20 Q.  Turn to the next page. At the top left under the
21 heading of adjustments, it says – there's another
22 exclamation sign –
23 A.  Yeah.
24 Q.  – and the word "warning." Do you see that?
25 A.  Yes.

## Page 114

1  Q.  Underneath that, it says "NEVER," in capital
2  letters, "attempt to clean chute or make any adjustments
3  while engine is running. Do you see that?
4  A.  Yes.
5  Q.  You read that before the accident?
6  A.  Yes.
7  Q.  You understood it?
8  A.  Yes.
9  Q.  Sir, would you agree that on the date of this
10 accident, you didn't follow that instruction?
11 A.  At the time the accident took place, yes.
12 Q.  Sir, do you know what part or component of the
13 snow thrower came into contact with your hand to cause that
14 injury?
15 A.  I have no idea.
16 Q.  You never looked at it afterwards to determine
17 that?
18 A.  No, I did not.
19 Q.  Do you know whether or not the part or component
20 that came into contact with your hand and caused your injury
21 was rotating or moving at the time?
22 A.  It was not rotating and moving at the time as far
23 as I know.
24 Q.  If the component was not moving at the time, how
25 was it that it caused a portion of your finger to be cut

## Page 115

1  off?
2  A.  I have no idea.
3  Q.  With how much force did you press your hand down
4  into the discharge chute in your attempt to clear the snow?
5  A.  I cannot tell you, but nominal force or effort.
6  Q.  You told me earlier that as far as you know, that
7  snow thrower has never been used again since the date of the
8  accident; isn't that right?
9  A.  That's correct, yes.
10 Q.  Is it possible that one of your children used it
11 when you weren't around?
12 A.  Nope. They're not allowed to touch it.
13 Q.  You feel confident they would follow your
14 instructions in that regard?
15 A.  Absolutely right.
16 Q.  Is it possible it was borrowed by someone else in
17 the neighborhood?
18 A.  No. I don't lend my tools to anyone.
19 Q.  Okay.
20
21        (Defendant's Exhibit No. 16, marked for
22 identification.)
23
24 Q.  (By Mr. Bogdanski) Sir, I've marked as
25 Exhibit 16, two more photographs of some of the labels or

## Page 116

1  warnings on the snow thrower. Take a look at them, please.
2  A.  Both of these, yes.
3  Q.  Do you recognize those as being the labels or
4  some of the labels that were on your snow thrower?
5  A.  As far as I know, yes.
6  Q.  Are those labels that you had occasion to see and
7  read in the 12 years that you used the machine before the
8  date of the accident?
9  A.  Yes.
10 Q.  Did you understand them?
11 A.  Yes.
12 Q.  And the label on the lower photograph marked as
13 I-14 on Exhibit 16, that shows a color depiction of the same
14 warning label that we talked about in the manual; is that
15 correct?
16 A.  Yes.
17 Q.  It says, "Danger: Shut off engine before
18 unclogging discharge chute"?
19 A.  Yes.
20 Q.  You understood that warning label?
21 A.  Yes.
22 Q.  You understood it was dangerous to do that
23 without following that precaution?
24 A.  Yes.
25 Q.  Again, could you tell me why on the date of the

### Page 117

1  accident, you didn't shut off the motor?
2  A.  I have no idea.
3  Q.  Sir, have you given any written statements to
4  anyone about this accident?
5  A.  Nope, besides my attorney.
6  Q.  Besides your attorney?
7  A.  Nope.
8  Q.  Have you given a written statement to your
9  attorney?
10  A.  Nope – can I answer the interrogatory?
11  MR. VIDONE:  For the record, you're not asking
12  him about the interrogatories?
13  MR. BOGDANSKI:  I'm not talking about the
14  interrogatory responses.
15  THE WITNESS:  Yes.
16  Q.  (By Mr. Bogdanski) Other than that, you've given
17  no written statements?
18  A.  That's right.
19  Q.  Given no recorded statements?
20  A.  Nope.
21  Q.  You don't know of any witnesses?
22  A.  No.
23  Q.  Other than Mr. Wilder, have you spoken to any
24  investigators?
25  A.  No.

### Page 118

1  Q.  Have you spoken to anyone other than Mr. Wilder
2  or your attorney about this accident?
3  A.  Nope – I had to tell my university.
4  Q.  University?
5  A.  Yeah.
6  Q.  Now, the injury to your – withdrawn. Could you
7  describe for me the injuries that you sustained in this
8  accident?
9  A.  I think it's in the report, medical report.
10  Q.  I'm sure it is. I'd like you in your own words
11  to tell me what injuries you sustained?
12  A.  Amputation of the upper digit, of the – of my
13  right ring finger, fracture of the small right finger, and a
14  cut to the middle finger.
15  Q.  Did you sustain any injuries to any other part of
16  your body?
17  A.  No.
18  Q.  Now, you told me earlier that you were
19  transported by ambulance to the Hartford Hospital; is that
20  correct?
21  A.  Yes.
22  Q.  Did you receive any medical attention or care
23  from the ambulance attendants?
24  A.  Yes.
25  Q.  Can you tell me what that was?

### Page 119

1  A.  They gave me painkillers.
2  Q.  You know what kind?
3  A.  I have no idea what the specific name of the
4  painkiller is, but something to reduce my pain.
5  Q.  Did they provide any other care to you or medical
6  treatment, I should say?
7  A.  Can you rephrase the question, please?
8  Q.  Again, I'm talking about the point in time when
9  the ambulance attendants came out, picked you up, and put
10  you on a stretcher?
11  A.  Yep.
12  Q.  During that period of time, other than giving you
13  some painkillers, did they give you any other medical
14  attention?
15  A.  No.
16  Q.  What happened at the hospital?
17  A.  At the hospital, they checked me into the
18  emergency room, and I was seen by Dr. Caputo and his
19  resident doctor. And they took a look at the digit and
20  decided to proceed onto the operating table to do the
21  necessary –
22  Q.  Okay. And what operation procedure did you
23  undergo at that time?
24  A.  Well, at the time, they tried to fix up the cut
25  on my middle finger, the digit part of it, and the small

### Page 120

1  finger.
2  Q.  Okay. And what, if anything, did they attempt to
3  do with regard to the finger that had been cut off?
4  A.  Well, they had already taken a decision that the
5  cut off part cannot be connected back –
6  Q.  Okay.
7  A.  – because it was in a very damaged condition.
8  Q.  And that operation took place on the day of your
9  initial admission to the hospital?
10  A.  On the sixth of February.
11  Q.  How long did you stay in the hospital?
12  A.  To the next day or the day after – I think 2
13  days, I am not so sure. The records will tell you.
14  Q.  Did you undergo any further operation procedures
15  at that time?
16  A.  No.
17  Q.  Did you receive any other treatment other than
18  pain medications?
19  A.  Therapy.
20  Q.  Okay. Tell me about that?
21  A.  Well, I started to get this phantom pain. I saw
22  my primary care physician Dr. Luger. He advised me to go to
23  the Pain Management Center, and I got treatment from them.
24  I was referred to Eastern Rehabilitation Center, and I went
25  through that particular treatment.

### Page 145

1  Q.  If you e-mailed then on 5/17/01, they had to be
2  taken either that day or before.
3  A.  That's correct.
4  Q.  What was the purpose in taking those photographs?
5  A.  By that time, I had already talked with Attorney
6  Sack, and he asked me to take pictures of that.
7  Q.  Were you attempting to depict or show anything in
8  particular about the snow thrower when you took those
9  photographs?
10  A.  No, I was just taking a picture of the snow
11  thrower.
12  Q.  Sir, how did the condition of the snow thrower,
13  as it existed on the day of the accident, how did it compare
14  to its condition when you purchased it back in 1989?
15  A.  I can't say anything about that.
16  Q.  You don't know if it was the same or if there
17  were any changes?
18  A.  Nope.
19  Q.  Sir, do you believe that the manufacturer of the
20  snow thrower should have provided some additional warnings
21  or instructions to you?
22  A.  Probably.
23  Q.  Okay. On what subjects?
24  MR. VIDONE:  I'm going to object, but you can
25  answer.

### Page 146

1  THE WITNESS:  On the safety issue.
2  Q.  (By Mr. Bogdanski) Okay. Safety of what?
3  A.  On the equipment itself.
4  Q.  Okay. What aspect of the safety issue did you
5  need additional warnings or instructions on?
6  A.  Such that accidents can be prevented.
7  Q.  And how can they be prevented?
8  A.  By giving better instructions and directions.
9  Q.  Would you agree, sir, that, however, you didn't
10  follow the instructions and directions that were given?
11  A.  That day, yes.
12  Q.  Do you think if a different instruction or
13  direction was given, you might have followed that?
14  A.  Probably.
15  Q.  Then again, you might not have followed that
16  either –
17  MR. VIDONE:  Objection.
18  Q.  (By Mr. Bogdanski) – is that true?
19  A.  Probably.
20  MR. VIDONE:  This is an ongoing objection.
21  MR. BOGDANSKI:  I understand that.
22  Q.  (By Mr. Bogdanski) Do you have an idea of a
23  specific statement or language you think should have been
24  included on this machine?
25  A.  No idea. Maybe an expert can tell you.

### Page 147

1  (Discussion was held off the record.)
2  Q.  (By Mr. Bogdanski) Sir, as far as you know, are
3  you requiring any additional medical treatment for your
4  injury?
5  A.  Probably.
6  Q.  And which doctors told you you would require
7  additional treatment?
8  A.  My principal – what do you call, physician –
9  primary care physician.
10  Q.  And who is that?
11  A.  Dr. Luger.
12  Q.  What has Dr. Luger told you about your need for
13  future or additional medical treatment?
14  A.  With respect to prosthesis, I will need to get a
15  prosthesis done.
16  Q.  Okay.
17  A.  With respect to the pain management, as soon as
18  it gets more unbearable, I will go to him, and he will
19  prescribe another method.
20  Q.  He will prescribe what?
21  A.  Another way of curing it.
22  Q.  Okay. Any other additional treatment you were
23  told you may have to incur?
24  A.  The therabath treatment is permanently for my
25  life.

### Page 148

1  Q.  Okay.
2  A.  And the over-the-shelf painkillers are going to
3  be a part of my life.
4  Q.  Okay. Anything else?
5  A.  And the psychological treatment, if it comes up.
6  Q.  Okay. Now, you mentioned that the height of the
7  snow at the garage door area was between 24 and 26 inches?
8  A.  That's right.
9  Q.  And I think you also said as you went down the
10  driveway and approached the street the height of the snow
11  increased?
12  A.  That's correct.
13  Q.  Can you tell the approximate height of the snow
14  at the point where the chute became clogged?
15  A.  I don't recall, but approximately 26 to
16  28 inches.
17  Q.  Okay. And, sir, why was it, if you know, that
18  the height of the snow was different at that location of the
19  driveway as opposed to the garage doors?
20  A.  Because the main street was already cleaned up.
21  Q.  Had the plows pushed some additional snow into
22  the mouth of your driveway?
23  A.  That's correct.
24  Q.  That was the area you hit –
25  A.  That's correct.