Exhibit C

# SHERTUKDE -V- MTD PRODUCTS - LESLIE N. WILDER, P.E. - 12/3/03

## Page 1 to Page 184

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT   06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

### Page 17

1  Q  Okay. And I take it that was an inspection –
2  withdrawn.
3  Where was that inspection?
4  A  In Simsbury.
5  Q  Would that be at Mr. Shertukde's home?
6  A  Yes.
7  Q  Then the next activity of any substance was your
8  participation in the inspection on June 5th of 2003 in
9  Fairfield?
10  A  Yes.
11  Q  And again that involved three-and-a-half hours for
12  inspection and 6/10ths of an hour for study time?
13  A  Whatever it says down there is what I had.
14  Do you want me to confirm what you're reading? .6
15  hours for study, yes.
16  Q  And three-and-a-half hours attending inspection?
17  A  Yes.
18  Q  And then the next activity is spending 8 hours
19  writing your report?
20  A  And considering the matters, yes.
21  Q  Okay. That 8 hours is your analysis, as well as
22  actually writing?
23  A  Yes.
24  Q  Okay. And then that's basically it, until
25  November 24th, when you're essentially preparing for your

### Page 19

1  forth in your report are based on the activities you
2  undertook as listed in Exhibit 3?
3  A  In conjunction with my background and training,
4  yes.
5  Q  Okay. Sir, are these your final trial opinions?
6  A  Yes.
7  Q  At this point in time have you completed your
8  assignment?
9  A  I may be asked to do something else, there may be
10  new information that comes up, but in the absence of that,
11  this is it.
12  Q  At this point in time you feel that you've done
13  everything you've been asked to do?
14  A  Yes.
15  Q  Unless a specific additional request is made of
16  you, you don't intend to do anything further?
17  A  That's correct.
18  Q  Sir, I'd ask, since the purpose of today's
19  deposition is for me to learn about what your opinions and
20  conclusions are that you will be offering at trial, if
21  subsequent to today you obtain any additional information or
22  undertake any further activities that cause you to alter,
23  change or modify any of the opinions that you've given here
24  in your report or that we discuss today or that cause you to
25  formulate new or additional opinions, that you immediately



### Page 18

1  deposition and meeting with Attorney Vidone?
2  A  Yes. And, of course, in the interim there's some
3  thought being given to the case, but I don't always document
4  that.
5  Q  Fair enough.
6  Now, sir, based on the work that you've done, I
7  take it you've reached some opinions and conclusions?
8  A  Yes.
9  Q  Okay. And are those set forth in your report?
10  A  Yes.
11  Q  Do you have your report with you?
12  A  Yes.
13  (Defendant's Exhibit 9: Report of July 2,
14  2003, marked for identification).
15  BY MR. BOGDANSKI:
16  Q  All right, sir. We've marked as Exhibit 9 the
17  report of July 2nd, 2003.
18  Sir, does this set forth all of the opinions and
19  conclusions which you reached in this case?
20  A  Yes.
21  Q  After initially reaching those conclusions and
22  opinions, have you altered, changed or modified them in any
23  way?
24  A  No.
25  Q  And I take it the opinions and conclusions set

### Page 20

1  notify Attorney Vidone so that he can make me aware of that
2  and, if appropriate, we will reconvene to discuss it
3  further.
4  A  I will.
5  Q  Thank you.
6  Sir, can you just basically list for me the
7  opinions that you've reached in this matter?
8  A  In general, my opinion is based upon the fact that
9  the machine in question did not meet the ANSI standard in
10  the sense that it continued to rotate for a substantial
11  period of time after he released the controls. I found that
12  to be a defect in the machine.
13  I found also that the owner's manual contained no
14  information for the user to have any information about
15  checking the machine from time to time or any periodic
16  inspections to be sure it was operating safely. I found
17  that to be a defect.
18  I found that the machine also violated section 6.2
19  of the ANSI standard. That refers to the checking of the
20  machine to determine that it's operating safely.
21  That there could and, in my opinion, should have
22  been a utensil provided by the manufacturer to help clear
23  blockages of snow.
24  And that there should have been a more positive
25  stop than what the machine had to prevent the impeller from



Page 41

1  A   It's very difficult to do an evaluation of what
2  happened without seeing the machine.
3  Q   Where was the snow thrower located when you
4  arrived?
5  A   I don't recall whether it was just outside of the
6  garage or just inside the door of the garage. I believe the
7  door to the garage was open.
8  Q   Do you know where the snow thrower had been stored
9  or located since the date of the accident up to the time of
10 your inspection?
11 A   No, I don't know precisely. It was apparently at
12 his home. That's all I knew.
13 Q   Did you have occasion to discuss with Mr.
14 Shertukde what, if anything, had happened to the snow
15 thrower between the date of the accident and the date of
16 your inspection?
17 A   I had asked him that. And he said nothing had
18 happened. He had not used it and nothing had been done to
19 it.
20 Q   So Mr. Shertukde told you since the date of the
21 accident he had never used the snow thrower?
22 A   I believe he said no one had used it.
23 Q   Okay. And he told you that nothing had happened
24 to it, no changes had been made?
25 A   Yes. That's my recollection.

Page 42

1  Q   Now, you indicated that you had made some notes
2  from your conversation with Mr. Shertukde?
3  A   Yes.
4  Q   And would those be Exhibit 16?
5  A   Yes.
6  Q   Okay. Can you read into the record, please,
7  what's contained on Exhibit 16?
8  A   That he was an electrical and computer engineer.
9  I believe he said he was a professor at the University of
10 Hartford.
11 That a storm had occurred on the day before his
12 accident, February 5th of '01, starting at about twelve,
13 noon. That there was about 26 inches of wet snow that he
14 started to plow.
15 I noted it's a Yard-Man 5 horsepower, 24-inch
16 machine self-propelled. He said he had purchased it new in
17 1987 from, I believe, S&S in Hartford, and that he used it
18 over the years residentially.
19 The shop sold snow throwers and lawnmowers. He
20 had only used it winters personally for his own driveway,
21 initially in Windsor, where he had a driveway perhaps 50 or
22 60 feet long, L-shaped. That he had it maintained by a
23 local service for engine-tuning. That there were three
24 instances of maintenance. The first was at Bloomfield
25 Hardware. And the other two were by a local provider in

Page 43

1  Granby, a private individual.
2  He said on February 6 of '01, he started plowing
3  between 8:30 and 8:45 a.m. The snow had stopped – or the
4  snow stopped. He took one pass. At the end of the driveway
5  piled higher – I'm abbreviating. I'm going to insert some
6  words to describe what I think I meant at the time.
7  Q   I appreciate that.
8  A   Snow piled higher by Department, DM plow; I guess
9  the town plow. The engine kept running, but the machine
10 clogged. Has stick to clear chute. Have two to three times
11 in all the years owned. Apparently that's all the times he
12 had to clear the chute. He went to get the stick from the
13 garage. I have two times there. I don't know what that
14 means.
15 Engine still running. Used hand, gloved hand, got
16 stuck, injured. Ring finger of the right hand amputated.
17 Little finger multiple fractures. Middle finger gashed
18 open.
19 He cut the power, moved the impeller I think to
20 get his hand out. The impeller and auger was not moving.
21 The impeller was stuck. He had disengaged both wheels and
22 augers. He said impeller always turning. I don't know what
23 he meant by that.
24 I asked him what he thought was wrong with the
25 machine. He said there were no safety instructions, the

Page 44

1  labels could not be seen on guarding. I may have meant no
2  guarding.
3  Shutoff to engine. I don't know what that means.
4  Q   You had a reference there that he told you that
5  the impeller was not moving?
6  A   Impeller always --
7  Q   Or impeller always?
8  A   Impeller and auger not moving. Impeller stuck.
9  Q   And what did you understand he was talking about
10 there, at what point in time?
11 A   He looked at it before he stuck his hand in, and
12 things were not moving.
13 Q   Okay. So based on his observation, when he had
14 released the drive clutch and the auger clutch, that caused
15 the impeller and the auger to stop moving?
16 A   No. He just said that when he went back to clear
17 it out, he looked and nothing was moving.
18 Q   Okay. And that was after he had released the
19 auger clutch and the drive clutch, is that correct?
20 A   Well after.
21 Q   Did you also make a reference there at some
22 time –
23 A   I believe it was after.
24 Well, obviously, if he was moving the machine, he
25 wasn't looking at the auger. But he did say that he looked



### Page 101

1  Q   All right, sir. What is shown in photograph 31-B?
2  A   A portion of the impeller belt and its pulley.
3  Q   And the belt that seems to be broken or missing --
4  A   The back fabric of the belt is separated.
5  Q   Is that the frayed or worn condition you're
6  referring to?
7  A   Well, that's the frayed condition, yes.
8  Q   In your opinion, did that belt come from the
9  factory in that condition?
10 A   In my opinion, I don't think it would have come
11 from the factory in that condition. But it's possible, of
12 course.
13 Q   Okay. Wouldn't it be more reasonable to conclude
14 that the belt in that condition arose from use over, say, 12
15 to 14 years?
16 A   Yes.
17 Q   That's a more logical conclusion?
18 A   Yes.
19 Q   So that's a change in the condition of the belt
20 from that which existed at the time of manufacture and sale
21 most probably?
22 A   Yes.
23 Q   And are those conditions also depicted in Exhibit
24 photograph 31-C and 31-D?
25 A   Yes.

### Page 102

1  Q   Now, 31-C and 31-D also show what appears to be an
2  irregular mark along the edge of the pulley through which
3  the belt is routed. Do you see that?
4  A   Yes.
5  Q   Did you make an examination of that bend or
6  deformation in the edge of the pulley?
7  A   I did examine.
8  Q   And did that appear to you -- well, withdrawn.
9  What did your examination reveal?
10 A   That the periphery of the pulley was distorted
11 somewhat.
12 Q   Okay. And did that appear to be distorted by
13 application of a tool?
14 A   No way to know that.
15 Q   There were no tool marks that you could observe?
16 A   I could not tell from looking at the pulley what
17 caused that deformation. It may have come from the factory
18 that way. There's no way of knowing.
19 Q   Or certainly someone may have distorted it
20 attempting to remove the belt?
21 A   It's possible.
22 Q   And did you analyze the potential impact on the
23 function of the snow thrower of the worn and damaged belt
24 which you've documented with these photographs?
25 A   Typically something like that would have had the

### Page 103

1  effect of reducing the effectiveness of the snow thrower
2  allowing slippage to occur.
3  Q   Did you attempt to quantify it?
4  A   No.
5  Q   Did you attempt to analyze whether or not this was
6  a contributing factor in this accident?
7  A   Yes, I considered it, and I did not see any reason
8  why that could have or would have been a contributing factor
9  to this accident.
10 Q   Now, you also observed the fact that the belt at
11 the time of your inspection was misaligned?
12 A   Misrouted.
13 Q   Misrouted.
14 And am I correct that the misrouting of the belt
15 in the condition that you found it affected the ability of
16 the auger clutch to perform its job to disengage the auger
17 and the impeller?
18 A   It would have affected how the auger lever
19 affected the rotation of the impeller.
20 The question is hard to answer the way you've
21 asked it.
22 Q   All right. And maybe it was a poor question.
23 But based on your response, I take it the
24 misrouting of the belt -- and, by the way, "misrouting"
25 means it was put in a location that it was not designed or

### Page 104

1  intended to be in?
2  A   Yes.
3  Q   Okay. And the fact that the impeller belt was
4  misrouted affected the ability of the control lever, the
5  auger clutch, to perform its designed function?
6  A   Yes.
7  Q   And it's your belief that that's a condition that
8  most probably arose after the date of manufacture and sale
9  in 1987?
10 A   Yes.
11 Q   And did you attempt to analyze the potential
12 effect of the misrouting of the belt on the cause of this
13 accident?
14 A   I don't think this accident took place with the
15 belt in this misrouted condition.
16 Q   Why not?
17 A   Well, if indeed Mr. Shertukde had plowed his
18 driveway, I don't believe he could have done so with the
19 belt in this misrouted position. Therefore, my conclusion
20 is at the time of his accident the belt was not misrouted.
21 Q   Who misrouted the belt?
22 A   I don't know.
23 Q   When was the belt misrouted?
24 A   I don't know.
25 Q   Why was the belt misrouted?





### Page 105

1  A   I don't know.
2  Q   All right. Sir, I think you told me earlier that
3  it's your opinion that the most likely explanation for the
4  movement of the impeller which caused the injury to Mr.
5  Shertukde was that the force of the brake was overcome?
6  A   Yes.
7  Q   Okay. And have you conducted an engineering
8  analysis that permits you to reach an engineering conclusion
9  as to what caused the force of the brake to be overcome on
10 the day of this accident?
11 A   Well, we went over a little bit of that. It's a
12 system, and there are several elements in the system. One
13 of which is the belt, the second of which is the adjustment
14 of the belt, and the geometric relationships between the
15 pulleys, the belt, the idler pulley and the brake spring
16 forces, all of those things together function either to
17 cause the impeller to turn when the lever is depressed and
18 to stop turning when the lever is released.
19 And I think that any one or some combination of
20 changes to those elements could have caused and would most
21 likely have caused the impeller to turn.
22 Q   What type of changes?
23 A   Changes in the geometry. I don't know what the
24 tolerances were by the manufacturer. I don't know if those
25 tolerances were done to allow normal wear, tear and motion

### Page 106

1  to successfully stop the impeller from turning when the
2  lever is released.
3  Q   Just so I understand you. You're saying that
4  there was some changes in the belt, the adjustment of the
5  belt, the geometric relationship of the pulleys or the
6  spring forces that had to occur in order to permit the force
7  of the brake to be overcome?
8  A   No, I didn't quite say that.
9  It seems to me that that is likely. I don't know
10 that the design of this machine was proper to begin with,
11 and I don't know whether as this machine came from the
12 factory adjusted as the owner's manual suggests that
13 everything be adjusted, whether that impeller could turn
14 when the lever was released. It wasn't intended to, I'm
15 sure, but I don't know that it didn't come that way from the
16 factory.
17 Q   But you don't know that it did, either?
18 A   I don't know that it did, no.
19 Q   So you'd just be speculating to claim that it came
20 that way from the factory, wouldn't you?
21 A   You asked me for engineering judgment. That is
22 what I'm giving you.
23 Q   I'm asking for your findings.
24 Let's take a step back.
25 A   Sure.

### Page 107

1  Q   We already talked about the brake, and you didn't
2  find anything improper about the function of the brake, is
3  that right?
4  A   If we're going to go down this line, I didn't
5  analyze the complete braking analysis to see whether there's
6  something improper or proper. All I said was that it
7  apparently provided a resisting torque that more than met
8  the ANSI standards.
9  Q   Based on the extent of whatever inspection you
10 conducted --
11 A   Yes.
12 Q   -- you didn't find anything wrong with the brake?
13 A   That's correct.
14 Q   Okay. Based on the extent of whatever inspection
15 you conducted, did you find anything wrong with the pulleys?
16 A   Not really, no.
17 Q   Based on the extent of whatever inspection you
18 conducted, did you find anything wrong with the spring
19 forces?
20 A   I didn't analyze the spring forces.
21 Q   So you didn't find anything wrong with them, did
22 you?
23 A   I didn't find anything wrong with them, no.
24 Q   Based on the extent of whatever inspection you
25 conducted, did you find anything wrong with the adjustment

### Page 108

1  of the belt?
2  A   I believe the belt, the idler pulley was -- no.
3  The belt?
4  Q   The belt.
5  A   The belt was old. I don't know whether it was
6  stretched or not, and if it was stretched, by how much.
7  Q   Okay. Did you find any physical evidence
8  whatsoever with regard to any of the components that you
9  looked at to show that they were capable of creating a
10 condition that would overcome the force of the brake?
11 A   I think I did notice that the adjustment of the
12 idler pulley, I think there was a looseness in the
13 connection of it to its link that I don't believe was
14 appropriate. The owner's manual doesn't go into that. So I
15 think that was incorrect.
16 Q   Was the idler pulley the one that had abraded or
17 cut its way through the back of the housing?
18 A   No. We're talking just about the idler pulley
19 between the engine pulley and the impeller pulley.
20 Q   So you found that the adjustment of the idler
21 pulley was loose?
22 A   Yes.
23 Q   Okay. Did you determine the cause of the
24 looseness in that adjustment?
25 A   I don't know what you mean by "cause." The screw

### Page 113

1 physical components which you think did lead to the
2 occurrence of the accident?
3   A   Physically I couldn't tell you because I did not
4 take that belt off and re-route it to see how it might have
5 worked or not worked.
6 What I did is I went -- my conclusion is derived
7 from the fact that the auger/impeller lever was not held
8 down by Mr. Shertukde and that he lost his fingers in the
9 discharge chute, which meant that the impeller was turning
10 when it shouldn't have been turning.
11   Q   But you can't tell us why that occurred?
12   A   No, I cannot.
13 I can tell you in general that it occurred because
14 the brake was unable to keep the impeller from turning.
15   Q   But you can't tell us what conditions arose to
16 permit that to happen?
17   A   No.
18   Q   And you can't tell us at what point in time those
19 conditions arose?
20   A   I can go a little further. I can say based on the
21 ANSI standard and the fact that the brake seemed to provide
22 more resistance than necessary, that it was unlikely that it
23 was the brake that caused this problem, but it was more
24 likely that the belt was too tight and overrode the brake,
25 or that the brake in combination with the belt was just

### Page 114

1 unable to stop the impeller from turning.
2   Q   But you can't tell us when those conditions came
3 into existence?
4   A   No, I can't.
5   Q   So you can't give us an opinion that that was the
6 condition that existed at the time of manufacture and sale
7 in 1987?
8   A   I cannot.
9   Q   Now, moving back to page 2 of your report, you
10 talk about the design of the snow blower in general.
11   A   Yes.
12   Q   Now, you mentioned before that you consulted on
13 four or five other snow thrower cases?
14   A   Yes.
15   Q   And that's in your capacity as a litigation
16 consultant?
17   A   As an engineer.
18   Q   As a consulting engineer?
19   A   Yes.
20   Q   For attorneys in litigation?
21   A   Among other things, yes.
22   Q   But in regard to those four or five other snow
23 thrower cases you looked at, you looked at them when you
24 were consulting for attorneys in litigation?
25   A   Yes.

### Page 115

1   Q   Okay. Other than looking at those snow throwers
2 as part of your consulting to attorneys in litigation, have
3 you had any other direct involvement with snow throwers?
4   A   I use one.
5   Q   Okay. What kind do you use?
6   A   It's an AMF.
7   Q   What year is it?
8   A   Probably about 1974, or thereabouts.
9   Q   How long have you owned it?
10   A   Since then.
11   Q   Did you work for AMF at the time you purchased it
12 or acquired it?
13   A   Yes.
14   Q   What was your capacity at AMF then?
15   A   I was director of engineering for leisure
16 products.
17   Q   Director of engineering for what?
18   A   For the leisure product areas.
19   Q   Was that snow thrower one of the leisure products
20 that you oversaw in your capacity as director of
21 engineering?
22   A   Yes.
23   Q   Have you used it since 1974?
24   A   Yes.
25   Q   Does it work?

### Page 116

1   A   Yes.
2   Q   Is it a reasonably safe product?
3   A   Hard to say. I think so.
4 I think all snow throwers are inherently
5 dangerous.
6   Q   I'm asking about the one that was produced by AMF.
7   A   I didn't analyze and I didn't evaluate it for the
8 purposes of this deposition. I really can't answer the
9 question.
10   Q   Okay. Now, as director of engineering for leisure
11 products at AMF, what responsibility did you have for that
12 particular snow thrower?
13   A   Practically none.
14   Q   What was your responsibility, then?
15   A   I oversaw the engineering operations to see
16 whether the engineering staffs were working on the right
17 projects, that they were staffed properly, that they were
18 approaching things in what I considered an appropriate
19 manner, and occasionally I would get involved if there was a
20 technical issue to be resolved or to be addressed by many of
21 these engineering groups.
22   Q   Okay. But that AMF snow thrower was produced
23 while you were in that capacity at AMF?
24   A   I don't even know if that snow thrower was a
25 purchased item and re-branded.

### Page 129

1 correct?
2  A  Based as an engineering judgment, yes.
3  Q  You've never sat on the ANSI B71.3 committee?
4  A  That's correct.
5  Q  You've never been directly involved in the design
6 or manufacture of snow throwers?
7  A  That's correct.
8  Q  Moving on to page 4 of your report. That's where
9 you discuss your observed condition of the misrouting of the
10 drive belt?
11  A  Yes.
12  Q  And you state about two-thirds of the way down the
13 page that, "It is more likely that the belt moved from its
14 proper position at the time of the accident to its observed
15 position on June 5 at or after the time of the injury"?
16  A  Yes.
17  Q  What do you mean by that?
18  A  I don't know what you mean. I've stated -- What
19 about that sentence isn't clear?
20  Q  Okay. First of all, why do you think it's more
21 likely that the mispositioning of the belt occurred either
22 at or after the time of the injury?
23  A  Because had it been in that position prior to or
24 at the time of the injury, I don't believe the driveway
25 could have been plowed with this machine.

### Page 130

1  Q  And you say, "It is more likely that the belt
2 moved." Is it your opinion that the belt on its own could
3 have moved from a position of proper routing to the position
4 of improper routing that you found?
5  A  I would consider that unlikely.
6  Q  Why?
7  A  One, because one side of the belt would have to
8 move from one side of the pulley to the complete other side
9 of the idler pulley; and, number two, the other side of the
10 belt would had to have come out from between the pulley and
11 the keeper, both of which I think are unlikely events.
12  Q  So it's more likely that someone --
13  A  I'm sorry. The right side actually was tucked in
14 under the keeper. And I don't see any reasonable way for
15 that to have happened by itself.
16  Q  So it's more logical to assume that someone
17 intentionally mispositioned the belt at -- intentionally
18 positioned the belt in the location that you found it?
19  A  "Intentional" is the wrong word there. I would
20 say somebody moved it.
21  Q  Somebody moved it. Whether they intended it to be
22 there or not?
23  A  Correct.
24  Q  It required a positive act by someone to move it
25 to get it from the proper routing to the improper routing?

### Page 131

1  A  That would be my opinion.
2  Q  And we have no idea who did that?
3  A  That's right.
4  Q  And did you directly relate a misrouting of the
5 belt to the damage caused by the pulley cutting or abrading
6 its way through the rear of the housing?
7  A  No.
8  Q  Those are separate events?
9  A  I think they're separate events, yes.
10  Q  What was it then that gave rise to the idler
11 pulley, which I think you described it as, coming into
12 contact and eventually abrading or cutting its way through
13 the rear housing?
14  A  I just gave it a cursory look. It was at the end
15 of the inspection. We just opened it up. I wasn't even
16 sure what that component was.
17 It appeared to me just briefly that the belt had
18 stretched and there was no stop on that idler pulley's link
19 to prevent it from coming in contact with the housing. So
20 that's my first cursory look at that, was that the belt
21 stretched and stretched and stretched, and there's a spring
22 on the idler pulley pulling it that way, and there was
23 nothing that prevented it from going that far.
24  Q  And you identified the drive belt which you found
25 to be in a worn and deteriorated condition with a particular

### Page 132

1 number that you attributed to an MTD number?
2  A  Well, it was difficult to read, but I think all
3 but one of the digits was the same that I found in the
4 operator's manual.
5  Q  The belt that you identified, was that the belt
6 that was misrouted?
7  A  Yes.
8  Q  Did you also identify -- withdrawn.
9 Was that also the same belt that was through the
10 idler pulley which cut its way through the back of the
11 housing?
12  A  No.
13  Q  Okay. Did you identify the belt that was on the
14 idler pulley that cut its way through the back of the
15 housing?
16  A  I think I did, but I'd have to go back, and I'm
17 not sure I'd be able to determine that at this point.
18 I think it was the belt. I think the number is
19 7540338.
20  Q  Okay. And did you identify that as an original
21 equipment belt?
22  A  I could look at my photographs to see if it
23 showed. I don't know if it says MTD, but it had the same
24 number on it that the owner's manual shows, so I presume it
25 was on original equipment belt, or it could have been a

Page 153

1  A   Yes.
2  Q   That's your opinion?
3  A   Yes.
4  Q   All right. So you're offering, suggesting an
5  alternative safer design?
6  A   Yes.
7  Q   Are you talking about a design concept or an
8  actual design?
9  A   I don't understand what the distinction is.
10  Q   All right. You refer to a positive mechanical
11  lock?
12  A   Yes.
13  Q   Have you attempted to design a positive mechanical
14  lock that could be applied to this snow thrower?
15  A   I've thought about it a little bit, and I think
16  there are ways in which it could be done. I have not done
17  it.
18  Q   Why have you not done it?
19  A   Because I'm not being paid to design a snow
20  thrower for this company. Or a safer snow thrower.
21  Q   So although you've thought about it and you think
22  it might be possible to design a safer alternative design,
23  you have not undertaken the steps or the work necessary to
24  accomplish that?
25  A   That's correct.

Page 154

1  Q   You just gave it some thought in your mind?
2  A   Yes.
3  Q   You haven't reduced it to any sketch or drawing?
4  A   Oh, in the past I sketched it when I was having
5  lunch hours from time to time. I have a design, I have some
6  concepts that might work, but they're all in my head.
7  Q   You never tried to construct a prototype?
8  A   No.
9  Q   You never tried to test anything to see if your
10  design concepts would work?
11  A   That's correct.
12  Q   Have you attempted to evaluate any potential
13  impacts on the function or the safety of the machine that
14  your design concepts might have?
15  A   Yes. When I thought about it, I tried to think of
16  how it would be integrated and how it might work. Yes.
17  Q   Would you agree that a design concept has to be
18  tested and proven before it could be safely implemented into
19  a product?
20  A   It depends on whether you're talking about
21  somebody that intends to manufacture and sell something like
22  that, or whether somebody is thinking about, as in this
23  case, whether it seems reasonably feasible to do so.
24  Q   And what engineering analysis have you undertaken
25  to establish that your design concepts are reasonably

Page 155

1  feasible?
2  A   I have about 40-plus years of design experience.
3  And in my considered engineering judgment, such a design
4  would, if worked on, be possible to implement.
5  Q   Can you draw me a picture of what your design is?
6  A   I cannot.
7  Q   Can you describe for me the components that would
8  comprise your design?
9  A   I told you I had just given it some thoughts. One
10  of which would have some sort of centrifugal mechanism to
11  detect whether or not the pulley is rotating, and if the
12  pulley is rotating it would keep a mechanical lock away from
13  it, and when something comes to a stop it would allow a
14  positive engagement like a stick through bicycle spokes that
15  would prevent it from starting to rotate.
16  Q   But you can't draw me a picture of it?
17  A   I can sketch something, but I'm not going to do
18  it.
19  Q   Okay. Have you done any calculations for that
20  design concept?
21  A   You already know what I've done. I told you.
22  Q   You haven't done any calculations?
23  A   No, sir.
24  Q   You haven't done any testing?
25  A   In my head I've done some testing and I've done

Page 156

1  some calculations. And it's my considered judgment that a
2  competent engineer wold be able to design this, given some
3  time, some experiments and some testing, yes.
4  Q   All right. So in order for a competent engineer
5  to come up with this alternative design, it would take some
6  time, it would take some experiments, and it would take some
7  testing?
8  A   Just like any other mechanical design.
9  Q   Okay. And you haven't undertaken that process
10  yet?
11  A   It's not my position to do so.
12  Q   So the answer is no, you haven't?
13  A   I have not done it. Right.
14  Q   Are there any technical or scientific publications
15  that you're aware of that discuss applying this design
16  alternative to a snow thrower?
17  A   Not that I'm aware of.
18  Q   Are you aware of any competitor's products that
19  employ the positive mechanical lock alternative design that
20  you propose?
21  A   In the snow thrower area?
22  Q   In the snow thrower, yes.
23  A   No.
24  Q   So as far as you know, no snow thrower has ever
25  been manufactured that contains the positive mechanical lock



Page 161

1  What safety conditions dictate that?
2  A   I wouldn't stick my hand in a tiger's mouth even
3  if he had been trained to keep it open.
4  Q   If this machine had your hypothetical positive
5  mechanical stop, would you still stick your hand in the
6  chute with the engine running?
7  A   No.
8  Q   Why not?
9  A   Maybe if I was going to try to sell that concept
10 to a manufacturer, I might for demonstration purposes.
11 No. Why expose yourself to possible hazards? I
12 wouldn't do it.
13 Q   Because there's lots of things that can go wrong?
14 A   Yes.
15 Q   You then talk about a simple and inexpensive
16 utensil, perhaps similar to a plastic soup ladle, could have
17 been conveniently supplied and perhaps mounted to the
18 machine by the manufacturer for use in clearing such
19 blockages.
20 Have you ever seen such a device used?
21 A   By a snow thrower?
22 Q   Yes.
23 A   No.
24 Q   And I assume that would be a piece of equipment
25 that he'd use to clear off the chute?

Page 162

1  A   That's what it would be for, yes.
2  Q   In your opinion, the lack of a plastic ladle
3  renders this snow machine unreasonably dangerous?
4  A   It's one of the things that could have been easily
5  provided that would have made the machine less dangerous.
6  Q   My question, sir, is is it your opinion that the
7  lack of a plastic ladle renders this snow thrower
8  unreasonably dangerous?
9  A   The lack of all of the things we've talked about
10 makes this machine unreasonably dangerous.
11 If it had, for example, a way of keeping that
12 impeller from rotating positively, then there'd be nothing
13 wrong with putting your hand in.
14 I'm saying this is a dangerous machine and there
15 were numerous ways of making it safer. You don't say just
16 for the lack of this one. It's a reduction of the
17 probability of being injured. That's all I'm talking about
18 here.
19 Q   The two things you talked about are: (1) this
20 positive mechanical lock, and (2) the lack of a plastic soup
21 ladle; correct?
22 A   And I've talked about the fact that those would be
23 the elements that could prevent overriding of the brake. If
24 the brake were a completely different design or the system
25 was completely different so that there was very little

Page 163

1  probability of this thing turning, then maybe you wouldn't
2  need these.
3  I'm just saying this is something that's
4  inexpensive and easy, and had they put it there he would not
5  have had to walk back to the garage and not found something.
6  And I've heard this in other such accidents, where people
7  looked around, there's snow on the ground everywhere, and
8  nothing to clear the chute out with except their hands.
9  Q   Okay.
10 A   It's a system that we're talking about.
11 Q   And you're not aware of any snow thrower in the
12 world that incorporates your positive mechanical lock or the
13 plastic soup ladle?
14 A   I guess what I will have to do at some point is go
15 to the supermarket and get a plastic soup ladle and chain it
16 to my machine and then say I am aware of one.
17 Q   Okay. But until you do that --
18 A   Until I do that. Maybe by the time of trial, I
19 will have done that.
20 Q   But until you do that, your answer is no, you're
21 not aware of any?
22 A   That's correct.
23 Q   Including the very one that you use, yourself?
24 A   Including the very one.
25 Q   Have you seen a picture of the stick that

Page 164

1  Mr. Shertukde used to clear the clog from his snow chute?
2  A   No.
3  MR. BOGDANSKI:   Mark this as the next
4  exhibit, 32.
5  (Defendant's Exhibit 32: Photograph, marked
6  for identification).
7  BY MR. BOGDANSKI:
8  Q   Sir, I want to show you a photograph which I've
9  marked here as Exhibit 32, a photograph of a wooden stick,
10 with a 6-inch plastic ruler laying alongside to give you
11 some dimension, that has been represented to be the stick
12 that Mr. Shertukde had used over the years to clean snow
13 from his discharge chute.
14 The first question: Do you think that's an
15 adequate or appropriate tool for that purpose?
16 A   First, let me interrupt and say we're an hour
17 past. How much longer do you anticipate going?
18 Q   I think about ten minutes.
19 A   We'll go ten minutes and no longer without --
20 MR. VIDONE:   I have about five minutes.
21 A   We'll go 15 minutes, and that's it.
22 MR. BOGDANSKI:   Okay.
23 A   Now, your question was is this adequate and safe?
24 Q   Yes.
25 A   I have no opinion.