UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEMCHANDRA SHERTUKDE | : | NO.: 3:02CV620 (MRK) |
| | : | |
| v. | : | |
| | : | |
| MTD PRODUCTS, INC. | : | MARCH 29, 2004 |

**MOTION IN LIMINE TO PRECLUDE EVIDENCE OF
PROPOSED ALTERNATIVE DESIGN**

**I.   BACKGROUND:**

This is a products liability claim arising from a February 6, 2001, accident involving a Yard-Man snow thrower. The plaintiff Hemchandra Shertukde sustained a partial amputation of the tip of his right ring finger when he placed his hand into the discharge chute of the Yard-Man snow thrower with the auger clutch released but with the engine running. The plaintiff claims that certain design defects in the snow thrower caused his injury. The defendant incorporates herein by reference its Local Rule 56(a)1 Statement of Facts, together with supporting exhibits, **Exhibit A** through **Exhibit K**, which the defendant has submitted in support of its Motion for Summary Judgment, Motion in Limine to Preclude Evidence of Proposed Alternative Design, and Motion in Limine to Preclude Non-Disclosed Expert Opinions and Evidence of Subsequent Snow Thrower Design.

ORAL ARGUMENT IS REQUESTED

### A.  **Mr. Wilder's Alternative Design Opinion**

The plaintiff has disclosed Leslie Wilder as an engineering expert. In his report (**Exhibit B** to Local Rule 56(a)1 Statement), Mr. Wilder offers the opinion that the subject snow thrower was defective because it did not have a positive mechanical lock to prevent rotation of the impeller. He states in his report:

> A much safer design alternative would provide a positive mechanical lock against impeller rotation when the control lever was released. It would be technically and economically feasible to accomplish this.

(Wilder Report, **Exhibit B**, at pp.6-7.)

At his deposition, however, Mr. Wilder admitted that the alternative design he suggests is merely a concept he had thought about, and not an actual feasible design alternative derived through the scientific method. Mr. Wilder testified:

> Q:   Have you attempted to design a positive mechanical lock that could be applied to this snow thrower?
>
> A:   I've thought about it a little bit, and I think there are ways in which it could be done. I have not done it.
>
> Q:   Why have you not done it?
>
> A:   Because I'm not being paid to design a snow thrower for this company. Or a safer snow thrower.

> Q: So although you've thought about it and you think it might be possible to design a safer alternative design, you have not undertaken the steps or the work necessary to accomplish that?
>
> A: That's correct.
>
> Q: You just gave it some thought in your mind?
>
> A: Yes.
>
> Q: You haven't reduced it to any sketch or drawing?
>
> A: Oh, in the past I sketched it when I was having lunch hours from time to time. I have a design, I have some concepts that might work, but they're all in my head.
>
> Q: You never tried to construct a prototype?
>
> A: No.
>
> Q: You never tried to test anything to see if your design concepts would work?
>
> A: That's correct.

(Wilder Deposition, **Exhibit C** to Local Rule 56(a)1 Statement, at pp.153-154.)

Mr. Wilder was unable and unwilling to even attempt to draw a picture of his design alternative. (Wilder Deposition, **Exhibit C**, at p.155.) He is not aware of any technical or scientific publications that discuss applying this design alternative to a snow thrower. (Wilder Deposition, **Exhibit C**, at p.156.) He is not aware of any competitor's snow thrower products that employ the positive mechanical lock design that he proposes. (Id.)

Mr. Wilder admits that it would take experimentation and scientific testing by a competent engineer to convert his concept into an actual alternative design. He testified:

> Q: Alright. So in order for a competent design engineer to come up with this alternative design, it would take some time, it would take some experiments and it would take some testing?
>
> A: Just like any other mechanical design.
>
> Q: Okay. And you haven't undertaken that process yet?
>
> A: It's not my position to do so.
>
> Q: So the answer is no, you haven't?
>
> A: I have not done it. Right.

(Wilder Deposition, **Exhibit C**, at P.156.)

Mr. Wilder has undertaken no engineering analysis to permit him to say that his proposed "positive mechanical lock" would have prevented an injury in this accident. Even if the snow thrower did incorporate his proposed positive mechanical lock, Mr. Wilder concedes that the operator still would be exposed to a risk of injury if he were to place his hand into the discharge chute with engine running. He testified:

> Q: If this machine had your hypothetical positive mechanical stop, would you still stick your hand in the chute with the engine running?
>
> A: No.
>
> Q: Why not?

> A: Maybe if I was going to try to sell that concept to a manufacturer, I might for demonstration purposes. No. Why expose yourself to possible hazards? I wouldn't do it.
>
> Q: Because there's lots of things that can go wrong?
>
> A: Yes.

(Wilder Deposition, **Exhibit C**, at p.161.) Because Mr. Wilder does not know what "went wrong" to cause this accident, he cannot say that his design alternative would have made a difference in the outcome. Based on his limited analysis, Mr. Wilder can only opine that some ***unknown set of mechanical conditions*** existed at the time of the accident which, he believes, permitted the auger and impeller to move while the auger clutch control lever was in its released position. (Wilder Deposition, **Exhibit C**, at pp.113-114.) Mr. Wilder is not able to identify what those unknown mechanical conditions were, and cannot say why they occurred or when they came into existence. (Id.) Thus, he has absolutely no engineering or scientific basis to say that his proposed design alternative, even if it were feasible, would have prevented Mr. Shertukde's injury under the circumstances of this accident.

The defendant now moves to preclude any evidence or testimony from Mr. Wilder concerning his proposed alternative design for the reason that this proposed design alternative is merely an untested, and unproven, design concept which would mislead and confuse the jury.

II. **LAW AND ARGUMENT**:

Mr. Wilder's opinion that a "positive mechanical lock" would be a safer alternative design is untrustworthy and lacks any reasonable scientific foundation. His alternative design opinion is based upon speculation and assumptions not supported by the scientific method. Mr. Wilder's testimony would be misleading and of no assistance to the trier of fact. As such, it must be excluded under Federal Rules of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

A. **Court's Gatekeeping Function**

The trial court must act as gatekeeper to ensure the reliability and relevancy of proposed scientific expert testimony.

> Ultimately, it is the role of the trial court as gatekeeper to "ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

Travelers Property & Casualty Corp. v. General Electric Co., 150 F.Supp. 360, 364 (D. Conn. 2001), quoting Kumho Tire, 526 U.S. at 152.

In Cummins v. Lyle Industries, 93 F.3d 362 (7th Cir. 1996), the Seventh Circuit set forth a two-step analysis for evaluating testimony under Rule 702.

> First, the district court must determine whether the expert's testimony is reliable....[A] district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks.  In the context of theoretical and applied science, this requirement places on the court the obligation to ensure that the proffered testimony pertains to scientific knowledge.... ***[I]t must rule out subjective belief or unsupported speculation****....* Second, the district court has to determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.

Id. at 367-89 (emphasis added; citations and quotations omitted).  The Fifth Circuit applied this same approach in Watkins v. Telesmith, Inc., 121 F.3rd 984, 989 (5th Cir. 1997).  The inquiry envisioned by Rule 702 is a flexible one.  "Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission.  The focus, of course, must be on principles and methodology, not on the conclusions that they generate."  Id. citing Daubert v. Merrell, 509 U.S. at 594-95.

Simply stated, "a district court asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."  Cummins v. Lyle Industries, 93 F.3d at 368, citing Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996).

### B.  Need For Testing To Support Expert Opinion

In Daubert, the Supreme Court articulated several nonexclusive guideposts to assist the district courts in determining whether expert testimony fairly can be

characterized as a scientific opinion. These include: (1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence. Cummins v. Lyle Industries, 93 F.3d at 368. Application of these factors "is germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." Watkins v. Telesmith, Inc., 121 F.3rd at 991.

"The first and most significant Daubert factor is whether the proffered opinion has been subjected to the scientific method." Cummins, 93 F.3d at 368. Where proffered alternative design opinions clearly lend themselves to testing and substantiation by the scientific method, "the absence of such testing indicate[s] that the witness' proffered opinions could not fairly be characterized as scientific knowledge." Id. at 369.

Where a proffered design modification is unsupported by industry practice, published standards or peer review, testing may be the only way in which to demonstrate the feasibility, utility and safety of the design hypothesis. Both Daubert and Kumho emphasize the centrality of scientific testing and the Court's scrutiny of the soundness of that testing.

> This testing may involve only the allegedly defective design, or, in alternative design cases, could address the proposed alternative as well. ***Regardless, testing applies scientific or technical principles to the subject at issue. Before a court can evaluate the reliability of an expert's methodology, the expert must employ one.***

Milanowicz v. Raymond Corp., 148 F. Supp.2d. at 535 (emphasis added). "The absence of testing is a consistent factor in court decisions excluding expert testimony."

Id.

> ***Particularly in alternative design cases, merely conceptualizing possibilities is not alone sufficient***. Testing of the proposed alternative is often required. See Watkins, 121 F.3d at 992; Stanczyk, 836 F.Supp. at 567 ("[T]he history of engineering and science is filled with finely conceived ideas that are unworkable in practice."); see also Cummins v Lyle Indus., 93 F.3d 362, 368 (7th Cir. 1996) ("Our cases have recognized the importance of testing in alternative design cases.").

Milanowicz v. Raymond Corp., 148 F. Supp.2d. at 535 (emphasis added).

> Testing is critical to establish the feasibility of alternative designs:
>
> In alternative design cases, one of the most important aspects of an expert's testimony is whether the proposed alternative design or modification is feasible and/or compatible with the underlying design. This may involve computer analyses and calculations and likely involves testing of the proposed modifications.

Milanowicz v. Raymond Corp., 148 F. Supp.2d. at 535.

Testing and scientific analysis also are required to demonstrate the risk versus utility of the proposed design modification. Even if an alternative design is feasible, "the expert must address whether that modification will so affect the operation of the device that it makes it ineffective for its intended purpose." Id. at 536.

> There are a number of considerations which must inform such a conclusion. These include, but are not limited to, the degree to which the alterative design is compatible with existing systems and circuits; the relative efficiency of the two designs; the short- and long-term maintenance costs associated with the alternative design; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine.

Milanowicz, 148 F. Supp.2d. at 536 (citing to Cummins, 93 F.3d at 369). "Many of these considerations are product- and manufacturer-specific, and cannot be determined without testing." Id.

> **Without this type of analysis, courts are hard-pressed to find reliable an expert's conclusion regarding the defectiveness of the product and the appropriateness of the proposed alternative design.**

Milanowicz, 148 F. Supp.2d. at 536.

### C.   Need To Test Hypothesis Of Alternative Safer Design

The reported decisions emphasize the critical importance of testing an expert's hypothesis in an alternative design case.

In Colon v. BIC USA, Inc., 199 F. Supp.2d 53 (S.D.N.Y. 2001) (copy of decision attached for reference), the district court considered the reliability of an expert's opinion on a proposed alternative design for a cigarette lighter. The Court focused on the importance of testing the expert's alternative design hypothesis.

> While conjecture by a qualified expert is worthy of careful attention, the courtroom is "not the place for scientific guesswork, even of the inspired sort." Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir. 1996. The axiom that "[l]aw lags science [but] does not lead it," Id. at 319, applies equally to proposed engineering innovations in a design defect case. "[A]lternative designs by definition include elements of science, technology and methodology." Milanowicz v. Raymond Corp., 148 F.Supp.2d 525, 532 (D.N.J. 2001).

Colon v. BIC USA, Inc., supra at 75-76. The requirement of testing in a design defect case "ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit." Id.

> While testing is not an "absolute prerequisite" for an expert's theory of causation or alternative design to be admissible in a design defect case, it is usually critical to show that an expert "adhere[d] to the same standards of intellectual rigor that are demanded in their professional work." Cummins, 93 F.3d at 369. ***Adherence to engineering standards of intellectual rigor almost always requires testing of a hypothesis if the expert cannot point to an existing design in the marketplace***.[1]

---

[1] Daubert was decided in the context of a complex medical and scientific theory of causation in a toxic tort case. "Methodology" in cases of that sort refers to the scientific method: formulating and testing a hypothesis, conducting experiments, devising and employing controls, generating data, reasoning from the data to derive conclusions. The scientific method in a design defect case is the same: formulating a hypothesis that the design was defective because it lacked a certain feature or configuration which would have averted the accident. It is this hypothesis that must be tested in a design defect case. Kumho Tire extended Daubert's holding to all fields of technical or specialized knowledge. Kumho Tire, 522 U.S. at 147 ("all expert testimony"). Here, as in most design defect cases, the theory of causation and the alternative design is one and the same -- i.e., if the lighter had been designed with the proposed failsafe technology, the lighter would not have operated and Josue would not have been harmed.

Colon v. BIC USA, Inc., supra at 76 (emphasis added; footnote from original).  There is no general acceptance in the engineering community for a methodology that omits testing of a hypothesis.  The Court cited to Henry Petroski, "Reference Guide on Engineering Practice and Methods," Reference Manual on Scientific Evidence (Federal Judicial Center 2000), to show that the engineering community emphasizes the importance of testing to ensure even a modicum of reliability:

> Testing [a] hypothesis may involve years of work during which the engineers may find themselves faced with new problems....The engineer's experience will be not unlike that of scientists finding that they must modify their hypothesis as testing it reveals its weakness.

Id. at 78 (citing Reference Manual on Scientific Evidence at 586).  The fact that a proposed design alternative may be a relatively simple change does not establish either its safety or its effectiveness, absent proper scientific methodology and testing.

> [W]hat might appear to be a relatively simple design change for the better can drastically alter a system's behavior by introducing failure modes not even possible in the original design.  Seemingly simple and innocuous design changes can be among the most pernicious.

Id. at 79 (citing Reference Manual on Scientific Evidence at 602).

In Bourelle v. Crown Equipment Corp., 220 F.3d 532 (7th Cir. 2000), the Seventh Circuit Court of Appeals affirmed the district court's exclusion of the testimony

of plaintiff's expert in a forklift guarding case.  In that case, plaintiffs were injured while moving pallets in a Crown Turrett Stockpicker, TSP.  Plaintiff's expert, Daniel Pacheco, was a mechanical engineer with experience in investigating lift truck accidents, and seventeen years experience in designing and developing heavy vehicles and forklift trucks.  Pacheco opined that the TSP was designed with inadequate guarding, and offered the opinion that an alternative guard would have prevented plaintiff's injury.  The district court found Pacheco was well qualified to testify as an expert witness.  Nonetheless, it ruled that Pacheco's testimony was unreliable under Fed.R.Evid. 702 because his opinion as to an alternative safer guard had not been tested, nor had any attempt been made to prove its feasibility.

Essentially all of the factors that supported the district court exclusion of Pacheco's forklift guard opinion in <u>Bourelle</u> apply equally to Mr. Wilder's alternative design opinion in the present case.  In <u>Bourelle</u>, as in the present case, the plaintiff's expert (1) did not perform any calculations, (2) did not perform any testing, (3) did not evaluate the risk/utility of the proposed design, (4) did not prepare engineering drawings of his proposed design, (5) undertook no study to evaluate the feasibility of constructing or installing the proposed guard, (6) did not perform any computer analysis, and (7) did not submit his alternative design theories for peer review or recognized scientific approval.  (<u>Bourelle</u>, <u>supra</u> at 535.)

Based on the above, the district court in <u>Bourelle</u> concluded that Pacheco's opinions "fall into the category of subjective belief or unsupported speculation." It found that Pacheco's opinions were not supported by sufficient scientific evidence, and entered summary judgment in favor of the defendant. The Seventh Circuit affirmed.

For the same reasons articulated in <u>Bourelle,</u> Mr. Wilder's alternative design opinion must be excluded in the present case. The lack of proper methodology, the lack of scientific analysis, and the lack of a proper factual basis, make Mr. Wilder's opinions misleading, confusing, irrelevant and not of assistance to the trier of fact.

**D.     Mr. Wilder Performed No Engineering Analysis To Determine If His Proposed Alternative Safer Design Is Practical Or Feasible For This Application**

In <u>Potter v. Chicago Pneumatic Tool Co.</u>, 241 Conn. 199, 221 (1997), the Connecticut Supreme Court held that, "The availability of a feasible alternative design is a factor that the plaintiff may, rather than must, prove in order to establish that a product's risks outweigh its utility." Thus, a plaintiff in a design defect case is not required to offer evidence of a safer alternative design. Where a plaintiff elects to present alternative design evidence, however, there must be a showing that the proposed design alternative is feasible and practical. Otherwise, the alternative design evidence would be irrelevant, misleading and confusing, and would not assist the trier of fact.

In the present case, Mr. Wilder opines that his proposed positive mechanical lock would be a "much safer alternative design" and that it would be " technically and economically feasible."  (Wilder Report, **Exhibit B**, at p.6.)  Mr. Wilder offers no scientific analysis, however, to support those assertions.  Mr. Wilder conducted no engineering analysis to show that this proposed alternative design was feasible or practical for this application, or that it would have prevented an injury under the circumstances of this accident.  (Wilder Deposition, **Exhibit C**, at pp.153-156.)  As such, Mr. Wilder's proposed design alternative is merely a speculative concept, and not an actual design.

### III.    CONCLUSION:

Mr. Wilder's proposed alternative design is a speculative concept, unsupported and unproven by the scientific method.  As such, it is both unreliable and irrelevant under the Federal Rules of Evidence and case law.  Therefore, the defendant respectfully moves this Court for an order precluding the testimony of Mr. Wilder on his proposed safer alternative design, or in the alternative, holding a Daubert hearing as to

the reliability of Mr. Wilder's alternative design opinions and his qualifications to offer those opinions.

                                      DEFENDANT,
                                      MTD PRODUCTS, INC.


                                      By_____/s/ John J. Bogdanski_____
                                          John J. Bogdanski
                                          Howd & Ludorf
                                          65 Wethersfield Avenue
                                          Hartford, CT  06114
                                          (860) 249-1361
                                          (860) 249-7665 (Fax)
                                          ct06217

## **CERTIFICATION**

      This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail, to the following counsel of record this 29th day of March, 2004.

Gerald S. Sack, Esquire
Marc H. Vidone, Esquire
Sack, Spector & Karsten
836 Farmington Avenue
West Hartford, CT 06119

David W. Herrington, Esquire
Wegman, Hessler, Vanderburg & O'Toole
6055 Rockside Woods Blvd., Suite 200
Cleveland, OH  44131

                                                          /s/ John J. Bogdanski
                                                      John J. Bogdanski